# EXHIBIT A

**Docket No. 17/13839**
**Filed on 15 June 2018**
**Hearing of 20 September 2018**

To the Judge in charge of the proceedings of the 3rd Chamber, 4th Section of the Paris First Instance Court

<div style="border:1px solid;">

## PROCEDURAL PLEADINGS NO. 1

</div>

ON BEHALF OF:     **ALCATEL-LUCENT INTERNATIONAL,** a *société anonyme* registered with the Registry of Trade of Evry under No. 493 378 939, having its seat Route de Villejust, Nokia Center Paris Saclay, 91620 Nozay, represented by its legal representatives;

*Defendant in the main proceedings*

*Claimant to the procedural motion*

Represented by:

**Maître David Por**
Attorney at the Paris Bar
Allen & Overy LLP
52, avenue Hoche – 75008 Paris
Tel.: 01 40 06 54 00 – Fax: 01 40 06 54 54 – Locker J 022

AGAINST:     **INTELLECTUAL VENTURES II LLC,** a limited liability company incorporated under the laws of Delaware (United States of America), having its seat 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808, United States of America, represented by its Manager;

*Claimant in the main proceedings*

*Defendant to the procedural motion*

Represented by:

**Maître Julien Fréneaux**
Bardehle Pagenberg SELAS
Attorney at the Paris Bar
SO Square Opéra, 5 rue Boudreau – 75009 PARIS
Tel.: 01 53 05 15 00 – Fax: 01 53 05 15 05 – Locker P 0390

IN THE PRESENCE OF: **1. SOCIETE FRANCAISE DU RADIOTELEPHONE – SFR,** a *société anonyme* registered with the Registry of Trade of Paris under No. 343 059 564, having its seat 1 square Bela Bartok, 75015 Paris, represented by its legal representatives;

*Defendant in the main proceedings*

Represented by:

**Maître Michel Abello**
Attorney at the Paris Bar
SELARL Loyer & Abello
9, rue Anatole de la Forge - 75017 PARIS
Tel. : 01.45.02.60.80 - Fax : 01.45.02.60.95 – Locker J49

**2.** La société **HUAWEI TECHNOLOGIES France,** a *société par actions simplifiée à associé unique*, registered with the Registry of Trade of Nanterre under No. 451 063 739, having its seat  18-20 Quai du Point du Jour Arcs de Seine, 92100 Boulogne-Billancourt, represented by its legal representatives;

***Voluntary intervener in the main proceedings***

Represented by:

**Maître Grégoire Desrousseaux**
SCP August & Debouzy
Attorney at the Paris Bar
9, avenue de Messine – 75008 Paris
Tel. : 01 45 61 51 80 – Fax: 01 45 61 51 99 – Locker P438

## MAY IT PLEASE THE JUDGE IN CHARGE OF THE PROCEEDINGS

(1)     By three writs of summons of 10 October 2017, INTELLECTUAL VENTURES II LLC ("**Intellectual Ventures**") initiated parallel patent infringement lawsuits against the main French telecommunication network operators. According to the writs of summons, the operation of certain ADSL-type networks by these operators would constitute an infringement of the French part of European patent EP 1 694 020 (hereinafter "**EP 020**"). In the present proceedings, the main defendant is SOCIETE FRANCAISE DU RADIOTELEPHONE-SFR ("**SFR**").

ADSL-type networks are those that are used widely by individuals to access digital services (Internet, television...) through their standard telephone line, using what are often called "boxes", or DSL modems.

(2)     The writs of summons assert that two types of products are specifically at suit, namely, on the one hand, precisely the DSL modems provided by operators to their customers and, on the other hand, elements of the network itself called DSLAMs (also called digital subscriber line access multiplexers or DSL access multiplexers).

As these products were specifically targeted by the writs of summons, a series of voluntary and forced interventions took place in each litigation in order to involve the suppliers of the products at stake in the proceedings.

(3)     Unsurprisingly, it appeared on that occasion that the key actors in the global network equipment market – such as Huawei, ZTE, Nokia and its subsidiary Alcatel-Lucent – had supplied the DSLAMs to the operators sued by Intellectual Ventures.

Thus, in the present procedure, Huawei voluntarily intervened, and SFR sought the forced intervention of ALCATEL-LUCENT INTERNATIONAL ("**ALU**"), relying on a supply agreement dated 30 May 2001.

(4)     As Intellectual Ventures knows perfectly well, EP 020 is licensed to Nokia Corporation ("**Nokia**"), which in turn granted a sublicense to Alcatel Lucent S.A. and its affiliated companies . ALU and Alcatel Lucent S.A. are Affiliates of Nokia. As Intellectual Ventures also knows, an arbitral award, rendered between Intellectual Ventures and Nokia, confirmed that Nokia was entitled to grant this sublicense, so that Alcatel Lucent S.A.  and its affiliated companies are licensed under EP 020, which also covers the past. Although this award is challenged before the Delaware courts, the fact remains that the current state of things is that the products supplied by ALU are covered by a license granted by Intellectual Ventures.

(5)     Despite Intellectual Ventures' full awareness of these circumstances, the writ of summons does not address the specific situation of the products supplied by Nokia/ALU; it should be stressed in this respect that, to the contrary, in the litigation initiated in Germany, Intellectual Ventures explicitly **excluded** the products supplied by Nokia and its other licensees from the scope of the allegedly infringing products.

Nokia and ALU, through their counsel, therefore officially reminded Intellectual Ventures of the existence of the license and of the arbitral award interpreting it. They gave formal notice to Intellectual Ventures to (i) officially confirm that the products supplied by Nokia and/or ALU were covered by a licence under EP 020 and (ii) undertake to file pleadings specifying that the claims do not extend either to DSLAMs supplied by Nokia and/or ALU, or to networks to the extent that they are operated with products supplied by Nokia and/or ALU.

**Intellectual Ventures did not answer this letter.**

(6)   Thus, litigation is pending before the courts having jurisdiction between Nokia and Intellectual Ventures, concerning the precise scope of the license granted by Intellectual Ventures to Nokia, notably on EP 020, and specifically on whether this license was regularly extended to Alcatel Lucent S.A. and its Affiliates.

The outcome of this litigation is obviously decisive insofar as the present litigation concerns products supplied to SFR by ALU, since a licenced patent cannot, by hypothesis, be infringed.

**It is therefore imperative that the proceedings be stayed until the outcome of the action currently pending before the Delaware courts.**

# I.   THE CONTEXT OF THE PRESENT PROCEEDINGS

## 1.   THE PARTIES

### (a)   Intellectual Ventures

(7)   Intellectual Ventures[1] is an American company claiming to own "*one of the world's largest and fastest growing intellectual property rights portfolios*"[2]. It indeed owns a portfolio of 95,000 intellectual property assets, with nearly 30,000 involved in active monetization programs[3].

(8)   This is indeed the primary activity of Intellectual Ventures: its business model is to grant licenses on the patents it holds.

This demonstrates that Intellectual Ventures is a licensing professional, and that it is perfectly aware of the consequences of the licenses it grants.

(9)   Intellectual Ventures is notably the owner of patent EP 020[4], which is the subject of the present litigation.

### (b)   SFR

(10)   SFR[5] is one of the main French telephone operators; it operates both fixed and mobile telecommunication networks[6].

(11)   In this context, SFR notably supplies its customers high-speed Internet access. To this end, it has established networks operating according to various versions of ADSL standards, and provides its customers with boxes enabling them to access the networks.

### (c)   Nokia and ALU

(12)   Nokia is a Finnish multinational telecommunications company created in 1865[7], operating today in more than 100 countries and listed on the Helsinki, Paris and New York stock exchanges[8]. It is a leading innovator of the core technologies underpinning mobile phones and mobile data devices, and has more than two decades of innovation in cellular connectivity, voice and data transmission and reception, radio connectivity, antennas, multimedia, imaging, and other technologies. It is also an innovator in mobile networks, fixed data networks and optical data networks, advanced research and development for licensing, and new product businesses.

(13)   In April 2015, Nokia announced that it had agreed to purchase Alcatel Lucent, a French manufacturer of telecommunications infrastructure equipment, in an all-stock transaction. In January 2016, Nokia announced that it had acquired sufficient shares of Alcatel to control the company and begin functioning as a single corporation[9].

(14)   Alcatel-Lucent International (ALU) is a 100 % subsidiary of Nokia whose primary activity is the sale of telecommunications equipment and services.

---

[1]   Exhibit IV No. 2: Intellectual Ventures formation certificate
[2]   Exhibit No. 1: Intellectual Ventures Fact-sheet and partial translation
[3]   Exhibit No. 2: Intellectual Ventures' web page and partial translation
[4]   Exhibit IV No. 3: Patent EP 020 and Exhibit IV No. 4: Translation of the patent EP 020
[5]   Exhibit SFR 1.1: K-bis extract of SFR
[6]   Exhibit No. 3: Press article on Les Echos du Net, "*Fixed and mobile telephony markets in France*" and Exhibit No. 4: Press article on Journal du Net, "*Broadband and very high bandwidth market shares in France*"
[7]   Exhibit No. 5: Extract of Nokia's website – Our history and partial translation
[8]   Exhibit No. 6: Extract of Nokia's website – Stock information and partial translation
[9]   Exhibit No. 7: Nokia press release of 5 January 2016 and partial translation

(15)     ALU provides DSLAMs to SFR under an equipment supply, installation and commissioning agreement since 30 May 2001[10]. This agreement, initially concluded by parties whose successors in right are respectively SFR and ALU, contains a confidentiality clause preventing its disclosure to third parties, as well as the disclosure to third parties of the content and conditions of orders placed by SFR.

## 2.     FACTS AND PROCEEDINGS

### (a)     The infringement litigation initiated by Intellectual Ventures

(16)     By writ of summons of 10 October 2017, Intellectual Ventures sued SFR for infringement of the French part of EP 020. According to the writ of summons, the alleged infringement would notably result from the operation by SFR of ADSL2, ADSL2+ and VDSL networks, as well as the import, use and detention for these purposes, by this company, of DSLAMs operating according to the same standards.

(17)     SFR has sought the forced intervention of ALU by writ of 14 March 2018[11]. The joinder of the main proceedings and the forced intervention was ordered on 31 May 2018[12]. Thus, ALU is now a party to the litigation initiated by Intellectual Ventures[13].

### (b)     The licences granted under EP 020

(18)     EP 020 was licensed to Nokia Corporation by Intellectual Ventures under a confidential Patent License Agreement, which was then modified by an amendment (together, the *Patent License Agreement* or "**PLA**").

Intellectual Ventures never denied this fact.

(19)     This agreement includes provisions allowing Nokia Corporation, under certain conditions, to extend the benefit of the license to its affiliated companies.

When Nokia acquired the Alcatel-Lucent Group, it extended the benefit of the license to Alcatel Lucent S.A and its affiliated companies. ALU is one of Alcatel Lucent S.A.'s affiliated companies[14] [15].

### (c)     The arbitration proceedings on the interpretation of the PLA

(20)     A dispute has arisen between Nokia and Intellectual Ventures as to whether, under the relevant terms of the PLA, Nokia had the right to extend – and actually extended – the benefit of the license to Alcatel Lucent S.A. and its affiliated companies.

Because there is an arbitration clause in the PLA, this dispute was the subject of confidential arbitration proceedings between Nokia Corporation and Intellectual Ventures.

---

[10]     SFR Writ of summons (14 March 2018), page 4
[11]     IV writ of summons served on SFR (10 October 2017)
[12]     SFR Writ of summons (14 March 2018)
[13]     Strictly speaking, even if voluntary and forced interventions are subject to different administrative treatment by the Court Clerk, one could consider that ALU became a party to the main action as soon as it was sued (*see* in this respect S. Guinchard, P. Hoonakker, Dalloz Action Procédure Civile, ed. 2017, No. 312-46: "*As for the proceedings, the forced intervention extends them to the new claims it contains and to the third party it implicates. The third party becomes a party to the proceedings and must appear with counsel or solicitor, as the case may be.*").
[14]     Today, Alcatel-Lucent International is a subsidiary of Alcatel-Lucent Participations S.A, which in turn is a wholly owned subsidiary of Alcatel Lucent S.A. Alcatel Lucent S.A. is a wholly owned subsidiary of Nokia Solutions and Networks B.V., which in turn is a wholly owned subsidiary of Nokia Finance International B.V. Nokia Finance International B.V. is a wholly owned subsidiary of Nokia Corporation.
[15]     At the time of entering into the sublicense in May 2016, Alcatel-Lucent International was a subsidiary of Alcatel-Lucent Participations S.A, which in turn was a wholly owned subsidiary of Alcatel Lucent S.A. Alcatel Lucent S.A. was at that time a subsidiary of Nokia Corporation.

(21)   The arbitration proceedings led to a Decision and Final Award rendered on 25 April 2017 (the "**Award**").

The Award confirms that, under the terms of the PLA, the products of Alcatel Lucent S.A. and its affiliated companies are covered by the license agreement and the past products of Alcatel Lucent S.A. and its affiliated companies are released, which means in practice that Intellectual Ventures also relinquished the enforcement of its rights under EP 020 with respect to ALU's acts prior to the time it became a licensee under EP 020.

(22)   The PLA, the arbitration proceedings and the Award are all subject to strict confidentiality obligations, prohibiting their disclosure to third parties such as SFR or Huawei. That is why ALU is not in a position to file these elements as evidence in the proceedings at this stage.

(23)   However, there are public elements confirming the above facts.

Indeed, Intellectual Ventures has filed a petition to vacate the Award before the United States District Court for the District of Delaware.

Now, the public redacted version of Intellectual Ventures' petition to vacate the Award, dated 31 July 2017[16], indicates that:

- an Award was issued on 25 April 2017 between the parties;

- this Award concerned "*a commercial contractual relationship*" regarding "*patent license agreements*";

- under the two PLAs signed by the parties "*Intellectual Ventures granted Nokia rights to broad patent portfolios of Intellectual Ventures*" and;

- "*in May 2016 – months after the successful share exchange but before Nokia obtained 100% of Alcatel-Lucent's outstanding equity – Nokia initiated arbitration*".

(24)   Furthermore, the public redacted version of Intellectual Ventures' first pleadings in support of its motion to vacate the Award, also dated 31 July 2017[17], states that:

- the dispute arose from the PLA, "*the Nokia-Alcatel Lucent transaction*" and "*the Nokia-Alcatel Lucent Sublicenses*" and;

- "*the dispute concerns two separate Patent License Agreements ("PLA") whereby IV granted to Nokia licenses under IV's broad portfolio of telecommunication patents. Nokia purported to extend its license rights to Alcatel Lucent S.A., a major French telecommunications company ("Alcatel Lucent"), which Nokia acquired in 2016*".

---

14          Exhibit No. 8: Public version of Intellectual Ventures' petition to vacate the Award and partial translation
17          Exhibit No. 9: Public version of Intellectual Ventures' first pleadings and partial translation

> These elements of the public record confirm that:
>
> - Intellectual Ventures granted a licence to Nokia under a broad patent portfolio;
>
> - Nokia has, pursuant to the agreements, extended the benefit of this license to Alcatel Lucent S.A.
>
> - Intellectual Ventures challenged Nokia's right to extend the license to Alcatel Lucent S.A. before the arbitral tribunal having jurisdiction to interpret the PLA;
>
> - The decision of the arbitral tribunal was not favourable to Intellectual Ventures, since the latter is seeking to vacate it, while Nokia is seeking its confirmation[18].

(d)     Intellectual Ventures' refusal to exclude products supplied by ALU from the action

(25)    While it is true that the Award is currently being challenged, the fact remains that, in the current state of things:

  i.   Nokia is a licensee of EP 020;

  ii.  ALU products are also covered by the license to EP 020, and past ALU products are released.

It obviously results that, since the products supplied by ALU are covered by a licence granted by Intellectual Ventures, they cannot constitute an infringement of EP 020.

(26)    Knowing the key role played by Nokia/ALU in the market of network equipment, and taking into account the legal situation, it would have been natural for Intellectual Ventures to specify, in its writ of summons, that its claims would not extend to the products supplied to SFR by Nokia and/or ALU.

In fact, when it sued in Germany for infringement of the German part of EP 020, Intellectual Ventures requested some measures to be ordered, (i) regarding certain methods "*except the methods carried out with Nokia Solutions and Nokia Networks components (…)*" and (ii) regarding certain multiple carrier wave transmitters "*except the multiple carrier wave transmitters of Nokia Solutions and Nokia Networks (…)*"[19].

(27)    Intellectual Ventures has done no such thing in France.

That is why ALU, by official letter of its counsel dated 31 January 2018, requested Intellectual Ventures to: (i) officially acknowledge that the products supplied by Nokia and/or ALU were covered by a license to EP 020[20], and (ii) undertake to file pleadings specifying that the claims before the Court do not extend to DSLAMs supplied by Nokia and/or ALU, or networks to the extent that they are operated with products supplied by Nokia and/or ALU[21].

This letter remains unanswered.

(28)    By acting like this, Intellectual Ventures is breaching its contractual obligations under the terms of said PLA. Nokia and ALU thus reserve their right to claim redress for this breach before the arbitral tribunal having jurisdiction.

However, more immediately, the dismissal by the Delaware Court of Intellectual Ventures' petition to vacate the Award would lead to the necessary conclusion that the products supplied by ALU to

---

[16]     Exhibit No. 10: Public version of Nokia's Cross-Petition to Confirm Arbitral Award
[19]     Exhibit No. 11: Writ of summons in the German proceedings and partial translation
[20]     Such confirmation being requested, in respect of ALU products, subject to the outcome of the proceedings pending in Delaware.
[21]     Exhibit No. 12: Official letter dated 31 January 2018

SFR are covered by the license granted by Intellectual Ventures to Nokia, such that they cannot be infringing for that reason alone.

Thus, with respect to these products, and the networks to the extent that they are operated with these products, the outcome of the proceedings pending in Delaware is central, and constitutes a necessary prerequisite to any discussion of a potential infringement.

Therefore, the Judge in charge of the proceedings will stay the present litigation until the final outcome of the proceedings conducted before the United States District Court for the District of Delaware.

## II.     AS A MAIN REQUEST, THE STAY OF PROCEEDINGS

### 1.     THE COURT HAS NO JURIDICTION TO INTERPRET THE PLA

(29)    It is certainly true that the Court, ruling on a patent infringement suit over which it has jurisdiction, in principle also has jurisdiction to rule upon the defences raised on this occasion, even if they would in principle fall within the jurisdiction of another court. This constitutes the application of the principle according to which "the judge of the action is the judge of the exception", enshrined in Article 49 of the French Civil Procedure Code.

This principle, however, yields, as the Code provides, to the exclusive jurisdiction of another court. In particular, civil courts may in no case interpret agreements that the parties have submitted to an arbitration clause: such clause precisely establishes the exclusive jurisdiction of the arbitral tribunal, in accordance with Article 1448 of the French Civil Procedure Code.

(30)    In the present case, the PLA between Intellectual Ventures and Nokia contains an arbitration clause conferring exclusive jurisdiction on the arbitral tribunal to interpret the PLA.

That is precisely why Nokia and Intellectual Ventures brought their dispute before the said arbitral tribunal, which interpreted the PLA in its Award.

(31)    Two recent decisions, rendered in similar contexts, explicitly recalled the limits of the jurisdictional power of the infringement court in the presence of an agreement containing an arbitration clause:

> "***It is not for the Court to rule*** *either on the jurisdiction of the arbitral tribunal, or on the admissibility or merits of the claim*"[22].

> "*The Arbitral Tribunal has **exclusive jurisdiction** to interpret the licence agreement dated 6 March 2007 concluded between TCT MOBILE LIMITED and TELEFONAKTIEBOLAGET LM ERICSSON*"[23].

(32)    Thus, the Court does not have jurisdiction to rule upon the dispute between Nokia and Intellectual Ventures, which specifically concerns the issue of whether Nokia was entitled to extend the benefit of the licence to ALU, and whether it did so rightfully.

---

[22]    Paris First Instance Court, 7 September 2012, No. 10/02595 (Exhibit No. 13)
[23]    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 November 2013, No. 12/14922 (Exhibit No. 14)

## 2.    THE PROCEEDINGS SHOULD BE STAYED

### 2.1    The principle of the stay

(33)    These reasons have systematically led courts to stay proceedings when, in the context of infringement litigation, it is argued that an agreement, including an arbitration clause, grants a licence under the patent in suit.

A consistent line of case law thus states that the infringement court must stay the proceedings pending the decision of the arbitrators regarding the interpretation of the agreement, this being the only way to respect the exclusive jurisdiction of the arbitrators and to avoid conflicting decisions:

> "*The arbitral proceedings concern the interpretation of the agreement (...) The decision of the Arbitral Tribunal to come **may lead to the acknowledgement of an implied license to use the patent in suit and thus to the disappearance of any act of infringement** in the litigation on the merits brought before the Paris First Instance Court. In the interest of proper administration of justice and to avoid any conflicting decisions, the proceedings shall be stayed*"[24].

> "*The resolution of the dispute before the court **is conditioned by the content of the arbitral award** to come; indeed, the existence of the infringement is subject to the effective termination of the licence agreement, a point which is precisely referred to the arbitral court (...) Consequently, a stay of proceedings shall be granted*"[25].

> "*The outcome of such* [arbitral] *proceedings **will necessarily have an impact** on the infringement litigation, which is based in particular on the unauthorized use of the trademarks at issue subsequent to the termination of the protocol concluded between the parties; it therefore appears to be a matter of good administration of justice to stay proceedings until the final outcome of the arbitration proceedings, the purpose of which will be, inter alia, to determine the respective rights of the parties in respect of the trademarks at issue*"[26].

> "*The parties having expressly excluded any appeal to civil courts, it is necessary to uphold the dismissal of the claim for lack of jurisdiction and to stay the proceedings in the patent infringement litigation and the claims arising thereof*"[27].

> "*The Arbitral Tribunal has exclusive jurisdiction to interpret the licence agreement dated 6 March 2007 concluded between TCT MOBILE LIMITED and TELEFONAKTIEBOLAGET LM ERICSSON; **the outcome of the dispute is directly linked** to the question of whether or not the claimant has given the company TCT MOBILE LIMITED authorisation to market 3G mobile phones operating in 2G mode in France using its patented technology. (...) **Consequently, it is necessary to order the stay** of proceedings on all TELEFONAKTIEBOLAGET LM ERICSSON's claims regarding the operation in 2G mode of the products at issue, pending the award to be rendered by the Arbitral Tribunal*"[28].

(34)    A clear principle results from this extensive and consistent case law, namely that the court, ruling on infringement claims in the context of which it is necessary to interpret an agreement subject to an arbitration clause, must stay the proceedings.

---

[24]    Paris First Instance Court, 10 November 2011, No. 10/06335 (Exhibit No. 15)
[25]    Paris First Instance Court, order of the Judge in charge of the proceedings, 6 July 2006, No. 05/17791 (Exhibit No. 16)
[26]    Paris First Instance Court, 7 September 2012, No. 10/02595 (Exhibit No. 13)
[27]    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 June 2001, No. 00/10470 (Exhibit No. 17)
[28]    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 November 2013, No. 12/14922 (Exhibit No. 14)

(35)   This is particularly true in the present case. Indeed, not only does the PLA include an arbitration clause, but in addition an Award was rendered by the arbitral tribunal seized pursuant to this clause, which confirmed that the products supplied by ALU to SFR are covered by the provisions of the licence, and therefore cannot be infringing.

It is thus clear that the interpretation of the PLA is a precondition for any discussion on a potential infringement, which cannot exist if the products at issue are covered by a licence.

(36)   Since Intellectual Ventures has chosen to challenge the Award before the Delaware courts, it is appropriate to stay the proceedings until the final outcome of the proceedings currently pending, *i.e.* until (i) the petition brought by Intellectual Ventures to vacate the Award is definitively dismissed, or (ii) in the event the Award is vacated, until exhaustion of the remedies for annulment against the new award which will be rendered by the competent arbitral tribunal.

## 2.2    The scope of the stay

(37)   It will belong to Intellectual Ventures, or to any other party to the proceedings that so wishes, to present practically workable proposals to the Judge concerning the parts of the dispute before the Court, which could continue to be briefed despite the stay that will be ordered.

(38)   However, even before any potential pleadings to this effect are filed, ALU would like to emphasise two points.

(39)   **First**, the stay cannot be limited to the sole question of the guarantee requested by SFR against ALU, but must also necessarily extend to the infringement claims brought by Intellectual Ventures against SFR, at least insofar as they concern products supplied to SFR by ALU and networks operated with these products.

Indeed, the existence of a licence to the benefit of ALU, as acknowledged by the Award, would not only constitute an obstacle to SFR's guarantee claim against ALU, but above all would immediately deprive Intellectual Ventures' claims concerning these products and the networks operated with these products of any grounds.

Hence, the Court cannot rule on these main claims against SFR before exhaustion of the litigation concerning the Award.

(40)   **Second**, the stay must also concern the issue of the validity and of the scope of EP 020. Otherwise, ALU would be deprived of its right to a fair trial, which "*includes, inter alia, the right of the parties to the proceedings to file the submissions they consider relevant to their case*"[29].

There is no need to recall how central the issue of patent validity is in infringement litigation. The scope of the claims, for its part, is obviously decisive in assessing the infringing nature of the accused goods or processes.

Now, the PLA signed between Nokia and Intellectual Ventures contains a provision under which Intellectual Ventures may terminate Nokia's license over a wide range of patents in its entirety, if the licensee or any of its affiliates initiates or supports any action to challenge, notably, the validity or scope of any licensed patents. Since ALU argues, as acknowledged by the Award, that it is an affiliate of Nokia within the meaning of the PLA, it cannot challenge the validity or the scope of EP 020 without risking the termination of the PLA and the licence it grants to Nokia and its subsidiaries over a broad patent portfolio.

---

[29]    Exhibit No. 18: ECHR, 21 March 2000, Dulaurans vs. France, App. No. 34553/97, §33

If, by extraordinary, the arbitration ultimately denies ALU this qualification, ALU may again be able to challenge the validity and scope of EP 020, without exposing the Nokia Group as a whole to the risk of termination of the license granted on the broad patent portfolio covered by the PLA.

Consequently, it is essential that the stay also covers these issues. Otherwise ALU would be in a situation where it would not have been able to assert its defence in due course (since it is contractually prevented from doing so), nor could it assert it at the time when it would be contractually free to do so, because the Court would have ruled upon the matter.

> The Judge in charge of the proceedings shall order a stay pending the outcome of the arbitral proceedings. The stay must in any event extend, at the very least, to (i) the infringement claims brought by Intellectual Ventures against SFR insofar as they relate to products supplied to SFR by ALU and to networks operated with such products, (ii) SFR's guarantee call against ALU, (iii) the validity of EP 020 and (iv) its scope.

## III. IN THE ALTERNATIVE, BEFORE RULING ON THE STAY, INVESTIGATIVE MEASURES SHOULD BE ORDERED

(41)    The facts outlined above, evidenced by the public documents that ALU is in a position to file in the proceedings, amply demonstrate the need for a stay of proceedings.

### 1. ALU MUST BE ALLOWED TO PROVE THE FACTS IT INVOKES

(42)    If, however, by extraordinary, the Judge in charge of the proceedings were to consider that the facts alleged by ALU are insufficiently established, this would be the result of the constraints to which ALU is exposed. Indeed, on the one hand, it cannot communicate the PLA, the Award, or the documents relating to the proceedings pending in Delaware to parties other than Intellectual Ventures. On the other hand, it cannot communicate the supply agreement concluded with SFR to the other parties.

Thus, the source of the problem would reside in the legal impossibility for ALU to file the existing evidence in support of its claims.

(43)    Now, French case law, spurred on by the European Court of Human Rights, now enshrines a genuine "right to evidence" in situations of such nature. The French Supreme Court, for example, explicitly recognised the existence of such a right in a decision of 5 April 2012[30], rendered notably on the basis of Article 9 of the French Civil Procedure Code and Article 6 of the European Convention on Human Rights.

A fair trial, indeed, requires that a party be allowed to prove the facts necessary to the success of its claims, failing which that party is in reality deprived of the underlying substantive right. According to the old adage, *idem est non esse aut non probari* – literally *it is the same not to exist and not to be proven*; one might add that it is also the same thing not to exist not to be legally provable.

(44)    That is why a body of case law has developed that reconciles the right to evidence with other rights, typically related to issues of confidentiality or privacy, in particular through the use of investigative measures.

---

[30]    French Supreme Court, 5 April 2012, No. 11-14.177

(45)   In the present case, a licence was concluded between Nokia and Intellectual Ventures, which ALU cannot file as evidence to the proceedings. An Award was also rendered, confirming that ALU benefits from this licence, which ALU cannot file as evidence either. Finally, an agreement was concluded with SFR, and orders have been placed further to this agreement, which ALU cannot file as evidence.

The Judge in charge of the proceedings shall therefore, alternatively and before ruling on the request for a stay of the proceedings, order investigative measures to reconcile the obligations of confidentiality that bind ALU with its right to evidence.

## 2.   THE INVESTIGATIVE MEASURES REQUESTED

(46)   Several types of investigative measures could be considered in the present case. They share the fact that they allow access to the documents at stake, without however leading to a violation of the confidentiality obligations covering them.

### 2.1   Personal investigations of the Judge in charge of the proceedings

(47)   Articles 179 to 183 of the French Civil Procedure Code provide that the judge may "*in order to verify them, in any matter, take personal note of disputed facts*". The Judge may therefore undertake "*those own observations, evaluations, appraisals or reconstitutions that he considers necessary*".

(48)   For example, the Court may go to the scene[31], compare two works in the case of infringement litigation[32], take note of the existence of apparent defects, etc.

The Court may also take note of the contents of documents. Thus, the Lyon Court of Appeals, in a case concerning the opening of bankruptcy proceedings, considered that it was necessary for the Court to "*verify the figures necessary to determine the existence of default of payments*"[33]. The Court therefore ordered the parties to provide the Judge with a number of documents, including accounting documents and bank statements.

(49)   In a more directly relevant case, the Douai Court of Appeals[34] had to decide on a case involving several parties, one of which had entered into a settlement agreement containing terms relevant to the dispute, but also confidentiality provisions preventing its disclosure to the other parties.

The Court of Appeals reminded that there was a need to conciliate, on the one hand, the confidentiality obligations of the party at stake and, on the other hand, the necessities of the pending proceedings.

Hence, the Court ordered the communication of the full settlement agreement to the Judge himself (the first instance court had appointed an expert), so that the Judge can take personal notice of the relevant clauses, which he could then communicate to the parties so that they form part of the evidence in the proceedings.

This holding would be directly transposable to the case at hand, should the Judge in charge of the proceedings consider the evidence currently on file to be insufficient. Indeed, she could then order that the relevant documentation be provided to her, and excerpt from the documentation the relevant information, which could then be made the subject of adversarial debate, without leading to a breach of the confidentiality obligations.

---

[31]   Exhibit No. 19: Colmar Court of Appeals, 1st Civil Chamber, 20 March 1991, jurisdata 1991-049916
[32]   French Supreme Court, 1st Civil Chamber, 4 February 1992, No. 90-21.630
[33]   Exhibit No. 20: Lyon Court of Appeals, 25 February 2016, No. 15/09016
[34]   Exhibit No. 21: Douai Court of Appeals, 28 May 2015, No. 15/01372

(50)    In the event the evidence is deemed insufficient, it is therefore requested that the Judge in charge of the proceedings:

- orders the parties to provide her with the necessary elements for her personal investigation, concerning those aspects of the case that are deemed to require further evidence;

- examines these elements personally;

- takes note of the elements relevant to the issue under dispute, in a form ensuring compliance with the confidentiality obligations, and allow adversarial debate on these factual observations.

## 2.2    Judicial expertise

(51)    Another option would be to appoint an expert further to Articles 263 sqq. of the French Civil Procedure Code.

(52)    This is precisely the route commonly followed when confidential documents are seized in the context of an infringement seizure, to conciliate the confidentiality concerns with the conduct of the infringement proceedings[35]. In particular, it is common in this context that the Court only allows the counsel to the parties, but not the parties themselves, to take part in the expert proceedings, and that it explicitly orders measures preventing the further disclosure of the information at stake, including to the parties themselves[36].

(53)    In the present case, it is true that the task of the expert would be different from that undertaken further to an infringement seizure. In the latter scenario, indeed, confidentiality is generally not an obstacle to the seizure of documents insofar as they are relevant to the alleged infringement, such that the expert's task is to sort the documents depending on their relevance, in order to prevent the disclosure of irrelevant confidential documents to the patentee.

Here, the expert would, instead, be tasked with determining whether the confidentially submitted documents actually demonstrate the following facts:

- Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia;

- Nokia has extended the benefit of the license to ALU;

- The arbitral tribunal has determined that Nokia was entitled to do so;

- The PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent;

- There is a supply agreement between ALU and SFR;

- ALU has delivered DSLAMs to SFR pursuant to that supply agreement.

(54)    Whilst the mission of the expert would be different, the core idea, however, remains the same: an expert can be appointed to examine confidential documents that are potentially relevant to an infringement case, outside the presence of the parties themselves, in order to make factual findings concerning those documents, which can then be discussed in an adversarial manner before the Court.

---

[35]    E.g. Paris First Instance Court, order of the Judge in charge of the proceedings, 1st September 2017, No. 15/07015 (Exhibit No. 22), Paris First Instance Court, order of the Judge in charge of the proceedings, 1st December 2003 (Exhibit No. 23) confirmed by Paris Court of Appeals, 5 October 2011, No. 09/02423 (Exhibit No. 24)

[36]    Paris First Instance Court, order of the Judge in charge of the proceedings, 3 September 2010, No. 09/13109 (Exhibit No. 25)

## 2.3     Confidentiality club

(55)     The same concerns relating to the treatment of confidential information in judicial proceedings have led case-law to design the concept of "confidentiality clubs", using a model prevalent in other legal systems.

(56)     Case-law has thus underscored that "*whilst the constitution of such a club is not provided for by the legislation, it is not contrary to the principles underlying our law, since it allows both parties, in an adversarial manner, to agree on the evidence that can be used in the lawsuit opposing them*"[37].

It has also been held that the constitution of such a club constitutes a "*means to preserve potential confidentiality*"[38].

(57)     A number of decisions hence ordered the constitution of such a confidentiality club, by agreement of the parties or by order of the Court[39].

Typically, the club will be constituted by outside counsel representing each of the parties (accompanied by patent attorneys where the technical nature of the information at stake justifies it, which is not the case here), who are tasked with examining the documents under conditions preserving their confidentiality, each member of the club having to commit in writing to keep all the information strictly confidential; typically, it is also ordered that any subsequent disagreement will be ruled upon by the Judge[40].

(58)     In the present case, the constitution of a confidentiality club, tasked with reviewing the confidential documentation, can be an appropriate way to allow access to the confidential information at stake.

## 2.4     Any other investigative measure the Judge in charge of the proceedings would deem appropriate

(59)     Should the Judge in charge of the proceedings consider another investigative measure more appropriate, it is requested that such measure be ordered, under conditions allowing the disclosure of the confidential documentation (i) only to the Court and counsel to the parties, to the exclusion of the parties themselves, (ii) subject to a binding confidentiality commitment by those persons accessing the information, (iii) with a view of providing the Court and the parties with a report on the following facts:

- Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia;

- Nokia has extended the benefit of the license to ALU;

- The arbitral tribunal has determined that Nokia was entitled to do so;

- The PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent;

- There is a supply agreement between ALU and SFR;

- ALU has delivered DSLAMs to SFR pursuant to that supply agreement.

---

[37]     Paris First Instance Court, summary proceedings order, 13 February 2015, No. 15/00822 (Exhibit No. 26).
[38]     Paris First Instance Court, summary proceedings order, 18 June 2015, No. 15/05243 (Exhibit No. 27)
[39]     See: Paris First Instance Court, 13 February 2015, No. 15/00822 (Exhibit No. 26), Paris First Instance Court, interim proceedings, 12 December 2014, No. 14/60652 (Exhibit No. 28), Paris First Instance Court, 18 June 2015, No. 15/05243 (Exhibit No. 27)
[40]     Paris First Instance Court, summary proceedings order, 12 December 2014, No. 14/60652 (Exhibit No. 28)

In summary, if, by extraordinary the Judge in charge of the Proceedings were to consider that the facts alleged in support of the request for a stay are insufficiently evidenced, investigative measures should be ordered, with a view of establishing such facts under conditions preserving their confidentiality.

\* \* \*

## IV.    THE COSTS

(60)    Not only has Intellectual Ventures brought the present case with particular lack of care, in that it did not mention in its writ the specific situation of Nokia/ALU products despite its acute awareness of the existence of the PLA and of the arbitral proceedings, but in addition it has flatly ignored the request by Nokia and ALU to rectify the situation.

(61)    This has led ALU to incur costs in the present proceedings, which it should not have borne.

Intellectual Ventures will therefore be ordered to pay ALU the sum of 50,000 € (FIFTY THOUSAND EUROS) pursuant to Article 700 of the French Civil Procedure Code.

## ON THESE GROUNDS

The Judge in charge of the proceedings is requested to:

**A.** Considering Articles 378 and 1448 of the French Civil Procedure Code,

**Order** a stay of the present proceedings until the final outcome of the proceedings currently pending before the United States District Court for the District of Delaware regarding the request to vacate of the Award rendered on 25 April 2017 (Civil Action No. 17-1002-GMS);

**B.** In the alternative, prior to ruling on the motion for a stay of proceedings;

Considering Article 6§1 of the European Convention of Human Rights and Articles 143 sqq. of the French Civil Procedure Code,

1. **Order** the conduct of personal investigations by the Judge in charge of the proceedings as follows:

   o order the parties to provide her with the necessary elements for her personal investigation, concerning the following facts: (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and SFR; (vi) ALU has delivered DSLAMs to SFR pursuant to that supply agreement;

   o order that the Judge in charge of the proceedings shall examine these elements personally;

   o order that the Judge in charge of the proceedings shall take note of the elements relevant to the issue under dispute, in a form ensuring compliance with the confidentiality obligations, and allow adversarial debate on these factual observations.

Or:

2. **Appoint** an expert with the task of:

   o obtaining the relevant documents under conditions such as to preserve their confidentiality;

   o examining the said documents in the presence of the parties' attorneys, but excluding the parties themselves;

   o determining whether (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them

challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and SFR; (vi) ALU has delivered DSLAMs to SFR pursuant to that supply agreement;

- **Order** the parties to provide the expert with the relevant documents;

- **Order** that each participant to the expert proceedings shall submit an undertaking in writing to keep strictly confidential all the information exchanged during those proceedings, and to not disclose them to any third party (including the parties to the present litigation);

- **Order** the expert to submit his/her report, with taking care to preserve the confidentiality of the documents provided, to the Paris First Instance Court Registry within a period of eight weeks after the start of the expertise;

- **State that,** in the event of a challenge relating to the expertise, any hearing before the Court on this subject will be held in closed session;

Or:

3. **Order** the organisation of a confidentiality club comprising the outside counsel to each party to the proceedings;

- **Order** that each participant to the confidentiality club shall submit an undertaking in writing to keep strictly confidential all the information exchanged during those proceedings, and to not disclose them to any third party (including the parties to the present litigation);

- **Order that** this confidentiality club examines the relevant documents under conditions such as to preserve their confidentiality;

- **Order that** the confidentiality club determines whether (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and SFR; (vi) ALU has delivered DSLAMs to SFR pursuant to that supply agreement;

- **Order that** the confidentiality club drafts a joint report on its determinations;

- **Order that** any dispute on the functioning or conclusions of the confidentiality club shall be submitted to the Judge in charge of the proceedings, who shall hear it in closed session;

Or:

4. **Order** any other investigative measure the Judge in charge of the proceedings should consider appropriate, under conditions allowing the disclosure of the confidential documentation (i) only to the Court and counsel to the parties, to the exclusion of the parties themselves, (ii) subject to a binding confidentiality commitment by those persons accessing the information, (iii) with a view of providing the Court and the parties with a report on whether (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and SFR; (vi) ALU has delivered DSLAMs to SFR pursuant to that supply agreement;

**C.**  In any event,

**Order** INTELLECTUAL VENTURES II LLC to pay to ALCATEL-LUCENT INTERNATIONAL the amount of 50,000 € (FIFTY THOUSAND EUROS) pursuant to Article 700 of the French Civil Procedure Code;

**Order** INTELLECTUAL VENTURES II LLC to pay the judicial costs and rule that these costs may be collected by Me David Por, Attorney at law, pursuant to Article 699 of the French Civil Procedure Code.

<div align="right">

**WITH ALL DUE RESERVES**

</div>

## LIST OF EXHIBITS

**Exhibit No. 1:**      Intellectual Ventures Fact-sheet and partial translation

**Exhibit No. 2:**      Intellectual Ventures' web page and partial translation

**Exhibit No. 3:**      Press article on Les Echos du Net, "*Fixed and mobile telephony markets in France*"

**Exhibit No. 4:**      Press article on Journal du Net, "*Broadband and very high bandwidth market shares in France*"

**Exhibit No. 5:**      Extract of Nokia's website – Our history and partial translation

**Exhibit No. 6:**      Extract of Nokia's website – Stock information and partial translation

**Exhibit No. 7:**      Nokia press release of 5 January 2016 and partial translation

**Exhibit No. 8:**      Public version of Intellectual Ventures' petition to vacate the Award

**Exhibit No. 9:**      Public version of Intellectual Ventures' opening brief

**Exhibit No. 10**:     Public version of Nokia's Cross-Petition to Confirm Arbitral Award

**Exhibit No. 11**:     Writ of summons in the German proceedings and partial translation

**Exhibit No. 12:**     Official letter of 31 January 2018

**Exhibit No. 13**:     Paris First Instance Court, 7 September 2012, No. 10/02595

**Exhibit No. 14:**     Paris First Instance Court, order of the Judge in charge of the proceedings, 29 November 2013, No. 12/14922

**Exhibit No. 15:**     Paris First Instance Court, 10 November 2011, No. 10/06335

**Exhibit No. 16:**     Paris First Instance Court, order of the Judge in charge of the proceedings, 6 July 2006, No. 05/17791

**Exhibit No. 17:**     Paris First Instance Court, order of the Judge in charge of the proceedings, 29 June 2001, No. 00/10470

**Exhibit No. 18:**     ECHR, 21 March 2000, Dulaurans vs. France, App. No. 34553/97

**Exhibit No. 19:**     Colmar Court of Appeals, Civ. 1st, 20 March 1991, Jurisdata 1991-049916

**Exhibit No. 20:**     Lyon Court of Appeals, 25 February 2016, No. 15/09016

**Exhibit No. 21:**     Douai Court of Appeals, 28 May 2015, No. 15/01372

**Exhibit No. 22:**     Paris First Instance Court, order of the Judge in charge of the proceedings, 1st September 2017, No. 15/07015

| | |
|---|---|
| **Exhibit No. 23:** | Paris First Instance Court, order of the Judge in charge of the proceedings, 1st December 2003 |
| **Exhibit No. 24:** | Paris Court of Appeals, 5 October 2011, No. 09/02423 |
| **Exhibit No. 25**: | Paris First Instance Court, order of the Judge in charge of the proceedings, 3 September 2010, No. 09/13109 |
| **Exhibit No. 26:** | Paris First Instance Court, 13 February 2015, No. 15/00822 |
| **Exhibit No. 27:** | Paris First Instance Court, 18 June 2015, No. 15/05243 |
| **Exhibit No. 28:** | Paris First Instance Court, interim proceedings, 12 December 2014, No. 14/60652 |

# EXHIBIT B

**Docket No. 17/13838**
**Filed on 15 June 2018**
**Hearing of 20 September 2018**

To the Judge in charge of the proceedings of the 3rd Chamber, 4th Section of the Paris First Instance Court

<div style="border:1px solid">

PROCEDURAL PLEADINGS NO. 1

</div>

ON BEHALF OF:    **ALCATEL-LUCENT INTERNATIONAL,** a *société anonyme* registered with the Registry of Trade of Evry under No. 493 378 939, having its seat Route de Villejust, Nokia Center Paris Saclay, 91620 Nozay, represented by its legal representatives;

*Defendant in the main proceedings*

*Claimant to the procedural motion*

Represented by:

**Maître David Por**
Attorney at the Paris Bar
Allen & Overy LLP
52, avenue Hoche – 75008 Paris
Tel.: 01 40 06 54 00 – Fax: 01 40 06 54 54 – Locker J 022

AGAINST:    **INTELLECTUAL VENTURES II LLC,** a limited liability company incorporated under the laws of Delaware (United States of America), having its seat 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808, United States of America, represented by its Manager;

*Claimant in the main proceedings*

*Defendant to the procedural motion*

Represented by:

**Maître Julien Fréneaux**
Bardehle Pagenberg SELAS
Attorney at the Paris Bar
SO Square Opéra, 5 rue Boudreau – 75009 PARIS
Tel.: 01 53 05 15 00 – Fax: 01 53 05 15 05 – Locker P 0390

IN THE PRESENCE OF: **1. ORANGE**, a *société anonyme* registered with the Registry of Trade of Paris under No. 380 129 866, having its seat 78 rue des Olivier de Serres, 75015 Paris, represented by its legal representatives;

*Defendant in the main proceedings*

Represented by:

**Maître Sabine Age**
Attorney at the Paris Bar
SELARL Véron & Associés
1, rue Volney - 75002 PARIS
Tel. : 01.47.03.62.62 - Fax : 01.47.03.62.69 – Locker P024

**2.** La société **HUAWEI TECHNOLOGIES France,** a *société par actions simplifiée à associé unique*, registered with the Registry of Trade of Nanterre under No. 451 063 739, having its seat  18-20 Quai du Point du Jour Arcs de Seine, 92100 Boulogne-Billancourt, represented by its legal representatives;

**3. HUAWEI INTERNATIONAL CO LIMITED**, a company incorporated under the laws of Hong Kong, registered under No. 21733197, having its seat 9 Canton Road, 9/F, tower 6, the Gateway, Tsim Sha Tsui, Kowloon, HONG KNOG, CHINA, represented by its legal representatives;

*Voluntary interveners in the main proceedings*

Represented by:

**Maître Grégoire Desrousseaux**
SCP August & Debouzy
Attorney at the Paris Bar
9, avenue de Messine – 75008 Paris
Tel. : 01 45 61 51 80 – Fax: 01 45 61 51 99 – Locker P438

**4**. **SAGEMCOM BROADBAND SAS**, a *société par actions simplifiée* registered with the Registry of Trade of Nanterre under No. 440 294 510, having its seat 250 route de l'Empereur, 92500 RUEIL-MALMAISON, represented by its legal representatives;

*Voluntary intervener in the main proceedings*

Represented by:

**Maître Caroline Casalonga**
CASALONGA SAS SPE
Attorney at the Paris Bar
8 avenue Percier – 75008 Paris
Tel. : 01 45 61 22 31 – Fax. : 01 45 61 12 34 - Locker K177

**5.** **ZTE FRANCE SASU**, a *société par actions simplifiée à associé unique* registered with the Registry of Trade of Nanterre under No. 502 189 269, having its seat 114 rue de Galliéni 92100 BOULOGNE-BILLANCOURT, represented by its legal representatives;

*Voluntary intervener in the main proceedings*

Represented by:

**Maître Jean-Frédéric Gaultier**
TALIENS SELARL
Attorney at the Paris Bar
33 rue de Miromesnil – 75008 Paris
Tel. : 01 83 79 18 73 – Fax. : 01 83 79 18 75 – Locker D320

6. **SERCOM CORPORATION**, a company having its seat 8 F, n° 3-1, Yuanqu street, Nankang, Tapei 115, TAIWAN;

*Intervener in the main proceedings*

Represented by:

**Maître Ricard Rondoux**
SERARL BRG avocats
Attorney at the Paris Bar
8 avenue Victor Hugo - 75116 Paris
Tel. : 01 81 70 99 00 – Fax. : 01 45 01 76 20 – Locker R095

7. **ECI TELECOM**, a company having its seat 13/15 rue Jeanne Braconnier, 92360 MEUDON LA FORET, represented by its legal representatives;

*Intervener in the main proceedings*

Represented by:

**Maître Augustin PFIRSCH**
AARPI DARKANIAN et PFIRSCH
Attorney at the Paris Bar
44 rue de la Bienfaisance - 75008 Paris
Tel. : 01 77 35 70 10 – Fax. : 01 84 25 83 07 – Locker B1038

## MAY IT PLEASE THE JUDGE IN CHARGE OF THE PROCEEDINGS

(1)     By three writs of summons of 10 October 2017, INTELLECTUAL VENTURES II LLC ("**Intellectual Ventures**") initiated parallel patent infringement lawsuits against the main French telecommunication network operators. According to the writs of summons, the operation of certain ADSL-type networks by these operators would constitute an infringement of the French part of European patent EP 1 694 020 (hereinafter "**EP 020**"). In the present proceedings, the main defendant is ORANGE ("**Orange**").

ADSL-type networks are those that are used widely by individuals to access digital services (Internet, television...) through their standard telephone line, using what are often called "boxes", or DSL modems.

(2)     The writs of summons assert that two types of products are specifically also at suit, namely, on the one hand, precisely the DSL modems provided by operators to their customers and, on the other hand, elements of the network itself called DSLAMs (also called digital subscriber line access multiplexers or DSL access multiplexers).

As these products were specifically targeted by the writs of summons, a series of voluntary and forced interventions took place in each litigation in order to involve the suppliers of the products at stake in the proceedings.

(3)     Unsurprisingly, it appeared on that occasion that the key actors in the global network equipment market – such as Huawei, ZTE, Nokia and its subsidiary Alcatel-Lucent – had supplied the DSLAMs to the operators sued by Intellectual Ventures.

Thus, in the present procedure, HUAWEI TECHNOLOGIES FRANCE, HUAWEI INTERNATIONAL CO LIMITED, SAGEMCOM BROADBAND SAS and ZTE FRANCE have voluntarily intervened, and Orange sought the forced intervention of ALCATEL-LUCENT INTERNATIONAL ("**ALU**"), relying on the supply agreement No. 07 CG 162 having its effective date on 1st June 2007. Furthermore, the companies SERCOM CORPORATION and ECI TELECOM – who ALU supposes have supplied the DSL modems in dispute – have also intervened.

(4)     As Intellectual Ventures knows perfectly well, EP 020 is licensed to Nokia Corporation ("**Nokia**"), which in turn granted a sublicense to Alcatel Lucent S.A. and its affiliated companies. ALU and Alcatel Lucent S.A. are Affiliates of Nokia. As Intellectual Ventures also knows, an arbitral award, rendered between Intellectual Ventures and Nokia, confirmed that Nokia was entitled to grant this sublicense, so that Alcatel Lucent S.A. and its affiliated companies are licensed under EP 020, which also covers the past. Although this award is challenged before the Delaware courts, the fact remains that the current state of things is that the products supplied by ALU are covered by a license granted by Intellectual Ventures.

(5)     Despite Intellectual Ventures' full awareness of these circumstances, the writ of summons does not address the specific situation of the products supplied by Nokia/ALU; it should be stressed in this respect that, to the contrary, in the litigation initiated in Germany, Intellectual Ventures explicitly **excluded** the products supplied by Nokia and its other licensees from the scope of the allegedly infringing products.

Nokia and ALU, through their counsel, therefore officially reminded Intellectual Ventures of the existence of the license and of the arbitral award interpreting it. They gave formal notice to Intellectual Ventures to (i) officially confirm that the products supplied by Nokia and/or ALU were covered by a licence under EP 020 and (ii) undertake to file pleadings specifying that the claims do

not extend either to DSLAMs supplied by Nokia and/or ALU, or to networks to the extent that they are operated with products supplied by Nokia and/or ALU.

**Intellectual Ventures did not answer this letter.**

(6)    Thus, litigation is pending before the courts having jurisdiction between Nokia and Intellectual Ventures, concerning the precise scope of the license granted by Intellectual Ventures to Nokia, notably on EP 020, and specifically on whether this license was regularly extended to Alcatel Lucent S.A. and its Affiliates.

The outcome of this litigation is obviously decisive insofar as the present litigation concerns products supplied to Orange by ALU, since a licenced patent cannot, by hypothesis, be infringed.

**It is therefore imperative that the proceedings be stayed until the outcome of the action currently pending before the Delaware courts.**

## I.    THE CONTEXT OF THE PRESENT PROCEEDINGS

### 1.    THE PARTIES

#### (a)    Intellectual Ventures

(7)    Intellectual Ventures[1] is an American company claiming to own "*one of the world's largest and fastest growing intellectual property rights portfolios*".[2] It indeed owns a portfolio of 95,000 intellectual property assets, with nearly 30,000 involved in active monetization programs[3].

(8)    This is indeed the primary activity of Intellectual Ventures: its business model is to grant licenses on the patents it holds.

This demonstrates that Intellectual Ventures is a licensing professional, and that it is perfectly aware of the consequences of the licenses it grants.

(9)    Intellectual Ventures is notably the owner of patent EP 020[4], which is the subject of the present litigation.

#### (b)    Orange

(10)    Orange[5] is one of the main French telephone operators; it operates both fixed and mobile telecommunication networks[6].

(11)    In this context, Orange notably supplies its customers high-speed Internet access. To this end, it has established networks operating according to various versions of ADSL standards, and provides its customers with boxes enabling them to access the networks.

#### (c)    Nokia and ALU

(12)    Nokia is a Finnish multinational telecommunications company created in 1865[7], operating today in more than 100 countries and listed on the Helsinki, Paris and New York stock exchanges.[8] It is a leading innovator of the core technologies underpinning mobile phones and mobile data devices, and has more than two decades of innovation in cellular connectivity, voice and data transmission and reception, radio connectivity, antennas, multimedia, imaging, and other technologies. It is also an innovator in mobile networks, fixed data networks and optical data networks, advanced research and development for licensing, and new product businesses.

(13)    In April 2015, Nokia announced that it had agreed to purchase Alcatel Lucent, a French manufacturer of telecommunications infrastructure equipment, in an all-stock transaction. In January 2016, Nokia announced that it had acquired sufficient shares of Alcatel to control the company and begin functioning as a single corporation[9].

(14)    Alcatel-Lucent International (ALU) is a 100 % subsidiary of Nokia whose primary activity is the sale of telecommunications equipment and services.

---

[1]    Exhibit IV No. 2: Intellectual Ventures formation certificate
[2]    Exhibit No. 1: Intellectual Ventures Fact-sheet and partial translation
[3]    Exhibit No. 2: Intellectual Ventures' web page and partial translation
[4]    Exhibit IV No. 3: Patent EP 020 and Exhibit IV No. 4: Translation of the patent EP 020
[5]    Exhibit Orange 1.1: K-bis extract of Orange
[6]    Exhibit No. 3: Press article on Les Echos du Net, "*Fixed and mobile telephony markets in France*" and Exhibit No. 4: Press article on Journal du Net, "*Broadband and very high bandwidth market shares in France*"
[7]    Exhibit No. 5: Extract of Nokia's website – Our history and partial translation
[8]    Exhibit No. 6: Extract of Nokia's website – Stock information and partial translation
[9]    Exhibit No. 7: Nokia press release of 5 January 2016 and partial translation

(15)    ALU provides DSLAMs to Orange under an equipment supply having its effective date on 1st June 2007[10]. This agreement, initially concluded by parties whose successors in right are respectively Orange and ALU, contains a confidentiality clause preventing the disclosure to third parties of the content and conditions of orders placed by Orange.

## 2.    FACTS AND PROCEEDINGS

### (a)    The infringement litigation initiated by Intellectual Ventures

(16)    By writ of summons of 10 October 2017, Intellectual Ventures sued Orange for infringement of the French part of EP 020. According to the writ of summons, the alleged infringement would notably result from the operation by Orange of ADSL2, ADSL2+ and VDSL networks, as well as the import, use and detention for these purposes, by this company, of DSLAMs operating according to the same standards.

(17)    Orange has sought the forced intervention of ALU by writ of 30 March 2018[11]. The joinder of the main proceedings and the forced intervention was ordered on 31 May 2018[12]. Thus, ALU is now a party to the litigation initiated by Intellectual Ventures[13].

### (b)    The licences granted under EP 020

(18)    EP 020 was licensed to Nokia Corporation by Intellectual Ventures under a confidential Patent License Agreement, which was then modified by an amendment (together, the *Patent License Agreement* or "**PLA**").

Intellectual Ventures never denied this fact.

(19)    This agreement includes provisions allowing Nokia Corporation, under certain conditions, to extend the benefit of the license to its affiliated companies.

When Nokia acquired the Alcatel-Lucent Group, it extended the benefit of the license to Alcatel Lucent S.A. and its affiliated companies. ALU is one of Alcatel Lucent S.A.'s affiliated companies[14][15].

### (c)    The arbitration proceedings on the interpretation of the PLA

(20)    A dispute has arisen between Nokia and Intellectual Ventures as to whether, under the relevant terms of the PLA, Nokia had the right to extend – and actually extended – the benefit of the license to Alcatel Lucent S.A. and its affiliated companies.

Because there is an arbitration clause in the PLA, this dispute was the subject of confidential arbitration proceedings between Nokia Corporation and Intellectual Ventures.

---

[10]    Orange Writ of summons (30 March 2018), page 7
[11]    IV writ of summons served on Orange (10 October 2017)
[12]    Orange Writ of summons (30 March 2018)
[13]    Strictly speaking, even if voluntary and forced interventions are subject to different administrative treatment by the Court Clerk, one could consider that ALU became a party to the main action as soon as it was sued (*see* in this respect S. Guinchard, P. Hoonakker, Dalloz Action Procédure Civile, ed. 2017, No. 312-46: "*As for the proceedings, the forced intervention extends them to the new claims it contains and to the third party it implicates. The third party becomes a party to the proceedings and must appear with counsel or solicitor, as the case may be.*").
[14]    Today, Alcatel-Lucent International is a subsidiary of Alcatel-Lucent Participations S.A, which in turn is a wholly owned subsidiary of Alcatel Lucent S.A. Alcatel Lucent S.A. is a wholly owned subsidiary of Nokia Solutions and Networks B.V., which in turn is a wholly owned subsidiary of Nokia Finance International B.V. Nokia Finance International B.V. is a wholly owned subsidiary of Nokia Corporation.
[15]    At the time of entering into the sublicense in May 2016, Alcatel-Lucent International was a subsidiary of Alcatel-Lucent Participations S.A, which in turn was a wholly owned subsidiary of Alcatel Lucent S.A. Alcatel Lucent S.A. was at that time a subsidiary of Nokia Corporation.

(21)    The arbitration proceedings led to a Decision and Final Award rendered on 25 April 2017 (the "**Award**").

The Award confirms that, under the terms of the PLA, the products of Alcatel Lucent S.A. and its affiliated companies are covered by the license agreement and the past products of Alcatel Lucent S.A. and its affiliated companies are released, which means in practice that Intellectual Ventures also relinquished the enforcement of its rights under EP 020 with respect to ALU's acts prior to the time it became a licensee under EP 020.

(22)    The PLA, the arbitration proceedings and the Award are all subject to strict confidentiality obligations, prohibiting their disclosure to third parties such as Orange or the various suppliers who intervened in the proceedings.

That is why ALU is not in a position to file these elements as evidence in the proceedings at this stage.

(23)    However, there are public elements confirming the above facts.

Indeed, Intellectual Ventures has filed a petition to vacate the Award before the United States District Court for the District of Delaware.

Now, the public redacted version of Intellectual Ventures' petition to vacate the Award, dated 31 July 2017[16], indicates that:

- an Award was issued on 25 April 2017 between the parties;

- this Award concerned "*a commercial contractual relationship*" regarding "*patent license agreements*";

- under the two PLAs signed by the parties, "*Intellectual Ventures granted Nokia rights to broad patent portfolios of Intellectual Ventures*" and;

- "*in May 2016 – months after the successful share exchange but before Nokia obtained 100% of Alcatel-Lucent's outstanding equity – Nokia initiated arbitration*".

(24)    Furthermore, the public redacted version of Intellectual Ventures' first pleadings in support of its motion to vacate the Award, also dated 31 July 2017[17], states that:

- the dispute arose from the PLA, "*the Nokia-Alcatel Lucent transaction*" and "*the Nokia-Alcatel Lucent Sublicenses*" and;

- "*the dispute concerns two separate Patent License Agreements ("PLA") whereby IV granted to Nokia licenses under IV's broad portfolio of telecommunication patents. Nokia purported to extend its license rights to Alcatel Lucent S.A., a major French telecommunications company ("Alcatel Lucent"), which Nokia acquired in 2016*".

---

[16]    Exhibit No. 8: Public version of Intellectual Ventures' petition to vacate the Award and partial translation
[17]    Exhibit No. 9: Public version of Intellectual Ventures' first pleadings and partial translation

These elements of the public record confirm that:

- Intellectual Ventures granted a licence to Nokia under a broad patent portfolio;

- Nokia has, pursuant to the agreements, extended the benefit of this license to Alcatel Lucent S.A.;

- Intellectual Ventures challenged Nokia's right to extend the license to Alcatel Lucent S.A. before the arbitral tribunal having jurisdiction to interpret the PLA;

- The decision of the arbitral tribunal was not favourable to Intellectual Ventures, since the latter is seeking to vacate it, while Nokia is seeking its confirmation[18].

(d)    Intellectual Ventures' refusal to exclude products supplied by ALU from the action

(25)    While it is true that the Award is currently being challenged, the fact remains that, in the current state of things:

   i.    Nokia is a licensee of EP 020;

   ii.    ALU products are also covered by the license to EP 020, and past ALU products are released.

It obviously results that, since the products supplied by ALU are covered by a licence granted by Intellectual Ventures, they cannot constitute an infringement of EP 020.

(26)    Knowing the key role played by Nokia/ALU in the market of network equipment, and taking into account the legal situation, it would have been natural for Intellectual Ventures to specify, in its writ of summons, that its claims would not extend to the products supplied to Orange by Nokia and/or ALU.

In fact, when it sued in Germany for infringement of the German part of EP 020, Intellectual Ventures requested some measures to be ordered, (i) regarding certain methods "*except the methods carried out with Nokia Solutions and Nokia Networks components* (…)" and (ii) regarding certain multiple carrier wave transmitters "*except the multiple carrier wave transmitters of Nokia Solutions and Nokia Networks* (…)"[19].

(27)    Intellectual Ventures has done no such thing in France.

That is why ALU, by official letter of its counsel dated 31 January 2018, requested Intellectual Ventures to: (i) officially acknowledge that the products supplied by Nokia and/or ALU were covered by a license to EP 020[20], and (ii) undertake to file pleadings specifying that the claims before the Court do not extend to DSLAMs supplied by Nokia and/or ALU, or networks to the extent that they are operated with products supplied by Nokia and/or ALU[21].

This letter remains unanswered.

(28)    By acting like this, Intellectual Ventures is breaching its contractual obligations under the terms of said PLA. Nokia and ALU thus reserve their right to claim redress for this breach before the arbitral tribunal having jurisdiction.

---

[16]    Exhibit No. 10: Public version of Nokia's Cross-Petition to Confirm Arbitral Award
[19]    Exhibit No. 11: Writ of summons in the German proceedings and partial translation
[20]    Such confirmation being requested, in respect of ALU products, subject to the outcome of the proceedings pending in Delaware.
[21]    Exhibit No. 12: Official letter dated 31 January 2018

However, more immediately, the dismissal by the Delaware Court of Intellectual Ventures' petition to vacate the Award would lead to the necessary conclusion that the products supplied by ALU to Orange are covered by the license granted by Intellectual Ventures to Nokia, such that they cannot be infringing for that reason alone.

Thus, with respect to these products, and the networks to the extent that they are operated with these products, the outcome of the proceedings pending in Delaware is central, and constitutes a necessary prerequisite to any discussion of a potential infringement.

Therefore, the Judge in charge of the proceedings will stay the present litigation until the final outcome of the proceedings conducted before the United States District Court for the District of Delaware.

## II. AS A MAIN REQUEST, THE STAY OF PROCEEDINGS

### 1. THE COURT HAS NO JURIDICTION TO INTERPRET THE PLA

(29)    It is certainly true that the Court, ruling on a patent infringement suit over which it has jurisdiction, in principle also has jurisdiction to rule upon the defences raised on this occasion, even if they would in principle fall within the jurisdiction of another court. This constitutes the application of the principle according to which "the judge of the action is the judge of the exception", enshrined in Article 49 of the French Civil Procedure Code.

This principle, however, yields, as the Code provides, to the exclusive jurisdiction of another court. In particular, civil courts may in no case interpret agreements that the parties have submitted to an arbitration clause: such clause precisely establishes the exclusive jurisdiction of the arbitral tribunal, in accordance with Article 1448 of the French Civil Procedure Code.

(30)    In the present case, the PLA between Intellectual Ventures and Nokia contains an arbitration clause conferring exclusive jurisdiction on the arbitral tribunal to interpret the PLA.

That is precisely why Nokia and Intellectual Ventures brought their dispute before the said arbitral tribunal, which interpreted the PLA in its Award.

(31)    Two recent decisions, rendered in similar contexts, explicitly recalled the limits of the jurisdictional power of the infringement court in the presence of an agreement containing an arbitration clause:

> "*It is not for the Court to rule either on the jurisdiction of the arbitral tribunal, or on the admissibility or merits of the claim*".[22]

> "*The Arbitral Tribunal has exclusive jurisdiction to interpret the licence agreement dated 6 March 2007 concluded between TCT MOBILE LIMITED and TELEFONAKTIEBOLAGET LM ERICSSON*".[23]

(32)    Thus, the Court does not have jurisdiction to rule upon the dispute between Nokia and Intellectual Ventures, which specifically concerns the issue of whether Nokia was entitled to extend the benefit of the licence to ALU, and whether it did so rightfully.

---

[22]    Paris First Instance Court, 7 September 2012, No. 10/02595 (Exhibit No. 13)
[23]    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 November 2013, No. 12/14922 (Exhibit No. 14)

## 2.    THE PROCEEDINGS SHOULD BE STAYED

### 2.1    The principle of the stay

(33)    These reasons have systematically led courts to stay proceedings when, in the context of infringement litigation, it is argued that an agreement, including an arbitration clause, grants a licence under the patent in suit.

A consistent line of case law thus states that the infringement court must stay the proceedings pending the decision of the arbitrators regarding the interpretation of the agreement, this being the only way to respect the exclusive jurisdiction of the arbitrators and to avoid conflicting decisions:

> "*The arbitral proceedings concern the interpretation of the agreement (...) The decision of the Arbitral Tribunal to come **may lead to the acknowledgement of an implied license to use the patent in suit and thus to the disappearance of any act of infringement** in the litigation on the merits brought before the Paris First Instance Court. In the interest of proper administration of justice and to avoid any conflicting decisions, the proceedings shall be stayed*"[24].

> "*The resolution of the dispute before the court **is conditioned by the content of the arbitral award** to come; indeed, the existence of the infringement is subject to the effective termination of the licence agreement, a point which is precisely referred to the arbitral court (...) Consequently, a stay of proceedings shall be granted*"[25].

> "*The outcome of such* [arbitral] *proceedings **will necessarily have an impact** on the infringement litigation, which is based in particular on the unauthorized use of the trademarks at issue subsequent to the termination of the protocol concluded between the parties; it therefore appears to be a matter of good administration of justice to stay proceedings until the final outcome of the arbitration proceedings, the purpose of which will be, inter alia, to determine the respective rights of the parties in respect of the trademarks at issue*"[26].

> "*The parties having expressly excluded any appeal to civil courts, it is necessary to uphold the dismissal of the claim for lack of jurisdiction and to stay the proceedings in the patent infringement litigation and the claims arising thereof*"[27].

> "*The Arbitral Tribunal has exclusive jurisdiction to interpret the licence agreement dated 6 March 2007 concluded between TCT MOBILE LIMITED and TELEFONAKTIEBOLAGET LM ERICSSON; **the outcome of the dispute is directly linked** to the question of whether or not the claimant has given the company TCT MOBILE LIMITED authorisation to market 3G mobile phones operating in 2G mode in France using its patented technology. (...) **Consequently, it is necessary to order the stay** of proceedings on all TELEFONAKTIEBOLAGET LM ERICSSON's claims regarding the operation in 2G mode of the products at issue, pending the award to be rendered by the Arbitral Tribunal*"[28].

(34)    A clear principle results from this extensive and consistent case law, namely that the court, ruling on infringement claims in the context of which it is necessary to interpret an agreement subject to an arbitration clause, must stay the proceedings.

---

[24]    Paris First Instance Court, 10 November 2011, No. 10/06335 (Exhibit No. 15)
[25]    Paris First Instance Court, order of the Judge in charge of the proceedings, 6 July 2006, No. 05/17791 (Exhibit No. 16)
[26]    Paris First Instance Court, 7 September 2012, No. 10/02595 (Exhibit No. 13)
[27]    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 June 2001, No. 00/10470 (Exhibit No. 17)
[28]    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 November 2013, No. 12/14922 (Exhibit No. 14)

(35)   This is particularly true in the present case. Indeed, not only does the PLA include an arbitration clause, but in addition an Award was rendered by the arbitral tribunal seized pursuant to this clause, which confirmed that the products supplied by ALU to Orange are covered by the provisions of the licence, and therefore cannot be infringing.

It is thus clear that the interpretation of the PLA is a precondition for any discussion on a potential infringement, which cannot exist if the products at issue are covered by a licence.

(36)   Since Intellectual Ventures has chosen to challenge the Award before the Delaware courts, it is appropriate to stay the proceedings until the final outcome of the proceedings currently pending, *i.e.* until (i) the petition brought by Intellectual Ventures to vacate the Award is definitively dismissed, or (ii) in the event the Award is vacated, until exhaustion of the remedies for annulment against the new award which will be rendered by the competent arbitral tribunal.

## 2.2    The scope of the stay

(37)   It will belong to Intellectual Ventures or to any other party to the proceedings that so wishes, to present practically workable proposals to the Judge concerning the parts of the dispute before the Court, which could continue to be briefed despite the stay that will be ordered.

(38)   However, even before any potential pleadings to this effect are filed, ALU would like to emphasise two points.

(39)   **First**, the stay cannot be limited to the sole question of the guarantee requested by Orange against ALU, but must also necessarily extend to the infringement claims brought by Intellectual Ventures against Orange, at least insofar as they concern products supplied to Orange by ALU and networks operated with these products.

Indeed, the existence of a licence to the benefit of ALU, as acknowledged by the Award, would not only constitute an obstacle to Orange's guarantee claim against ALU, but above all would immediately deprive Intellectual Ventures' claims concerning these products and the networks operated with these products of any grounds.

Hence, the Court cannot rule on these main claims against Orange before exhaustion of the litigation concerning the Award.

(40)   **Second**, the stay must also concern the issue of the validity and of the scope of EP 020. Otherwise, ALU would be deprived of its right to a fair trial, which "*includes, inter alia, the right of the parties to the proceedings to file the submissions they consider relevant to their case*" [29].

There is no need to recall how central the issue of patent validity is in infringement litigation. The scope of the claims, for its part, is obviously decisive in assessing the infringing nature of the accused goods or processes.

Now, the PLA signed between Nokia and Intellectual Ventures contains a provision under which Intellectual Ventures may terminate Nokia's license over a wide range of patents in its entirety, if the licensee or any of its affiliates initiates or supports any action to challenge, notably, the validity or scope of any licensed patents. Since ALU argues, as acknowledged by the Award, that it is an affiliate of Nokia within the meaning of the PLA, it cannot challenge the validity or the scope of EP 020 without risking the termination of the PLA and the licence it grants to Nokia and its subsidiaries over a broad patent portfolio.

---

[29]    Exhibit No. 18: ECHR, 21 March 2000, Dulaurans vs. France, App. No. 34553/97, §33

If, by extraordinary, the arbitration ultimately denies ALU this qualification, ALU may again be able to challenge the validity and scope of EP 020, without exposing the Nokia Group as a whole to the risk of termination of the license granted on the broad patent portfolio covered by the PLA.

Consequently, it is essential that the stay also covers these issues. Otherwise ALU would be in a situation where it would not have been able to assert its defence in due course (since it is contractually prevented from doing so), nor could it assert it at the time when it would be contractually free to do so, because the Court would have ruled upon the matter.

> The Judge in charge of the proceedings shall order a stay pending the outcome of the arbitral proceedings. The stay must in any event extend, at the very least, to (i) the infringement claims brought by Intellectual Ventures against Orange insofar as they relate to products supplied to Orange by ALU and to networks operated with such products, (ii) Orange's guarantee call against ALU, (iii) the validity of EP 020 and (iv) its scope.

## III. IN THE ALTERNATIVE, BEFORE RULING ON THE STAY, INVESTIGATIVE MEASURES SHOULD BE ORDERED

(41)    The facts outlined above, evidenced by the public documents that ALU is in a position to file in the proceedings, amply demonstrate the need for a stay of proceedings.

### 1.    ALU MUST BE ALLOWED TO PROVE THE FACTS IT INVOKES

(42)    If, however, by extraordinary, the Judge in charge of the proceedings were to consider that the facts alleged by ALU are insufficiently established, this would be the result of the constraints to which ALU is exposed. Indeed, on the one hand, it cannot communicate the PLA, the Award, or the documents relating to the proceedings pending in Delaware to parties other than Intellectual Ventures. On the other hand, it cannot communicate the supply agreement concluded with Orange to the other parties.

Thus, the source of the problem would reside in the legal impossibility for ALU to file the existing evidence in support of its claims.

(43)    Now, French case law, spurred on by the European Court of Human Rights, now enshrines a genuine "right to evidence" in situations of such nature. The French Supreme Court, for example, explicitly recognised the existence of such a right in a decision of 5 April 2012,[30] rendered notably on the basis of Article 9 of the French Civil Procedure Code and Article 6 of the European Convention on Human Rights.

A fair trial, indeed, requires that a party be allowed to prove the facts necessary to the success of its claims, failing which that party is in reality deprived of the underlying substantive right. According to the old adage, *idem est non esse aut non probari* – literally *it is the same not to exist and not to be proven*; one might add that it is also the same thing not to exist not to be legally provable.

(44)    That is why a body of case law has developed that reconciles the right to evidence with other rights, typically related to issues of confidentiality or privacy, in particular through the use of investigative measures.

(45)    In the present case, a licence was concluded between Nokia and Intellectual Ventures, which ALU cannot file as evidence to the proceedings. An Award was also rendered, confirming that ALU benefits from this licence, which ALU cannot file as evidence either. Finally, an agreement was

---

[30]    French Supreme Court, 5 April 2012, No. 11-14.177

concluded with Orange, and orders have been placed further to this agreement, which ALU cannot file as evidence.

The Judge in charge of the proceedings shall therefore, alternatively and before ruling on the request for a stay of the proceedings, order investigative measures to reconcile the obligations of confidentiality that bind ALU with its right to evidence.

## 2.   THE INVESTIGATIVE MEASURES REQUESTED

(46)   Several types of investigative measures could be considered in the present case. They share the fact that they allow access to the documents at stake, without however leading to a violation of the confidentiality obligations covering them.

### 2.1   Personal investigations of the Judge in charge of the proceedings

(47)   Articles 179 to 183 of the French Civil Procedure Code provide that the judge may "*in order to verify them, in any matter, take personal note of disputed facts*". The Judge may therefore undertake "*those own observations, evaluations, appraisals or reconstitutions that he considers necessary*".

(48)   For example, the Court may go to the scene[31], compare two works in the case of infringement litigation,[32] take note of the existence of apparent defects, etc.

The Court may also take note of the contents of documents. Thus, the Lyon Court of Appeals, in a case concerning the opening of bankruptcy proceedings, considered that it was necessary for the Court to "*verify the figures necessary to determine the existence of default of payments*"[33]. The Court therefore ordered the parties to provide the Judge with a number of documents, including accounting documents and bank statements.

(49)   In a more directly relevant case, the Douai Court of Appeals[34] had to decide on a case involving several parties, one of which had entered into a settlement agreement containing terms relevant to the dispute, but also confidentiality provisions preventing its disclosure to the other parties.

The Court of Appeals reminded that there was a need to conciliate, on the one hand, the confidentiality obligations of the party at stake and, on the other hand, the necessities of the pending proceedings.

Hence, the Court ordered the communication of the full settlement agreement to the Judge himself (the first instance court had appointed an expert), so that the Judge can take personal notice of the relevant clauses, which he could then communicate to the parties so that they form part of the evidence in the proceedings.

This holding would be directly transposable to the case at hand, should the Judge in charge of the proceedings consider the evidence currently on file to be insufficient. Indeed, she could then order that the relevant documentation be provided to her, and excerpt from the documentation the relevant information, which could then be made the subject of adversarial debate, without leading to a breach of the confidentiality obligations.

(50)   In the event the evidence is deemed insufficient, it is therefore requested that the Judge in charge of the proceedings:

---

[31]   Exhibit No. 19: Colmar Court of Appeals, 1st Civil Chamber, 20 March 1991, jurisdata 1991-049916
[32]   French Supreme Court, 1st Civil Chamber, 4 February 1992, No. 90-21.630
[33]   Exhibit No. 20: Lyon Court of Appeals, 25 February 2016, No. 15/09016
[34]   Exhibit No. 21: Douai Court of Appeals, 28 May 2015, No. 15/01372

- orders the parties to provide her with the necessary elements for her personal investigation, concerning those aspects of the case that are deemed to require further evidence;

- examines these elements personally;

- takes note of the elements relevant to the issue under dispute, in a form ensuring compliance with the confidentiality obligations, and allow adversarial debate on these factual observations.

## 2.2     Judicial expertise

(51)     Another option would be to appoint an expert further to Articles 263 sqq. of the French Civil Procedure Code.

(52)     This is precisely the route commonly followed when confidential documents are seized in the context of an infringement seizure, to conciliate the confidentiality concerns with the conduct of the infringement proceedings[35]. In particular, it is common in this context that the Court only allows the counsel to the parties, but not the parties themselves, to take part in the expert proceedings, and that it explicitly orders measures preventing the further disclosure of the information at stake, including to the parties themselves[36].

(53)     In the present case, it is true that the task of the expert would be different from that undertaken further to an infringement seizure. In the latter scenario, indeed, confidentiality is generally not an obstacle to the seizure of documents insofar as they are relevant to the alleged infringement, such that the expert's task is to sort the documents depending on their relevance, in order to prevent the disclosure of irrelevant confidential documents to the patentee.

Here, the expert would, instead, be tasked with determining whether the confidentially submitted documents actually demonstrate the following facts:

- Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia;

- Nokia has extended the benefit of the license to ALU;

- The arbitral tribunal has determined that Nokia was entitled to do so;

- The PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent;

- There is a supply agreement between ALU and Orange;

- ALU has delivered DSLAMs to Orange pursuant to that supply agreement.

(54)     Whilst the mission of the expert would be different, the core idea, however, remains the same: an expert can be appointed to examine confidential documents that are potentially relevant to an infringement case, outside the presence of the parties themselves, in order to make factual findings concerning those documents, which can then be discussed in an adversarial manner before the Court.

---

[35]     E.g. Paris First Instance Court, order of the Judge in charge of the proceedings, 1st September 2017, No. 15/07015 (Exhibit No. 22), Paris First Instance Court, order of the Judge in charge of the proceedings, 1st December 2003 (Exhibit No. 23) confirmed by Paris Court of Appeals, 5 October 2011, No. 09/02423 (Exhibit No. 24)

[36]     Paris First Instance Court, order of the Judge in charge of the proceedings, 3 September 2010, No. 09/13109 (Exhibit No. 25)

## 2.3    Confidentiality club

(55)    The same concerns relating to the treatment of confidential information in judicial proceedings have led case-law to design the concept of "confidentiality clubs", using a model prevalent in other legal systems.

(56)    Case-law has thus underscored that "*whilst the constitution of such a club is not provided for by the legislation, it is not contrary to the principles underlying our law, since it allows both parties, in an adversarial manner, to agree on the evidence that can be used in the lawsuit opposing them*"[37].

It has also been held that the constitution of such a club constitutes a "*means to preserve potential confidentiality*"[38].

(57)    A number of decisions hence ordered the constitution of such a confidentiality club, by agreement of the parties or by order of the Court[39].

Typically, the club will be constituted by outside counsel representing each of the parties (accompanied by patent attorneys where the technical nature of the information at stake justifies it, which is not the case here), who are tasked with examining the documents under conditions preserving their confidentiality, each member of the club having to commit in writing to keep all the information strictly confidential; typically, it is also ordered that any subsequent disagreement will be ruled upon by the Judge[40].

(58)    In the present case, the constitution of a confidentiality club, tasked with reviewing the confidential documentation, can be an appropriate way to allow access to the confidential information at stake.

## 2.4    Any other investigative measure the Judge in charge of the proceedings would deem appropriate

(59)    Should the Judge in charge of the proceedings consider another investigative measure more appropriate, it is requested that such measure be ordered, under conditions allowing the disclosure of the confidential documentation (i) only to the Court and counsel to the parties, to the exclusion of the parties themselves, (ii) subject to a binding confidentiality commitment by those persons accessing the information, (iii) with a view of providing the Court and the parties with a report on the following facts:

- Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia;

- Nokia has extended the benefit of the license to ALU;

- The arbitral tribunal has determined that Nokia was entitled to do so;

- The PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent;

- There is a supply agreement between ALU and Orange;

- ALU has delivered DSLAMs to Orange pursuant to that supply agreement.

---

[37]    Paris First Instance Court, summary proceedings order, 13 February 2015, No. 15/00822 (Exhibit No. 26)
[38]    Paris First Instance Court, summary proceedings order, 18 June 2015, No. 15/05243 (Exhibit No. 27)
[39]    See: Paris First Instance Court, 13 February 2015, No. 15/00822 (Exhibit No. 26), Paris First Instance Court, interim proceedings, 12 December 2014, No. 14/60652 (Exhibit No. 28), Paris First Instance Court, 18 June 2015, No. 15/05243 (Exhibit No. 27)
[40]    Paris First Instance Court, summary proceedings order, 12 December 2014, No. 14/60652 (Exhibit No. 28)

In summary, if, by extraordinary the Judge in charge of the Proceedings were to consider that the facts alleged in support of the request for a stay are insufficiently evidenced, investigative measures should be ordered, with a view of establishing such facts under conditions preserving their confidentiality.

*      *

*

## IV.   THE COSTS

(60)   Not only has Intellectual Ventures brought the present case with particular lack of care, in that it did not mention in its writ the specific situation of Nokia/ALU products despite its acute awareness of the existence of the PLA and of the arbitral proceedings, but in addition it has flatly ignored the request by Nokia and ALU to rectify the situation.

(61)   This has led ALU to incur costs in the present proceedings, which it should not have borne.

Intellectual Ventures will therefore be ordered to pay ALU the sum of 50,000 € (FIFTY THOUSAND EUROS) pursuant to Article 700 of the French Civil Procedure Code.

## ON THESE GROUNDS

The Judge in charge of the proceedings is requested to:

**A.** Considering Articles 378 and 1448 of the French Civil Procedure Code,

**Order** a stay of the present proceedings until the final outcome of the proceedings currently pending before the United States District Court for the District of Delaware regarding the request to vacate of the Award rendered on 25 April 2017 (Civil Action No. 17-1002-GMS);

**B.** In the alternative, prior to ruling on the motion for a stay of proceedings;

Considering Article 6§1 of the European Convention of Human Rights and Articles 143 sqq. of the French Civil Procedure Code,

1. **Order** the conduct of personal investigations by the Judge in charge of the proceedings as follows:

   o   order the parties to provide her with the necessary elements for her personal investigation, concerning the following facts: (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and Orange; (vi) ALU has delivered DSLAMs to Orange pursuant to that supply agreement;

   o   order that the Judge in charge of the proceedings shall examine these elements personally;

   o   order that the Judge in charge of the proceedings shall take note of the elements relevant to the issue under dispute, in a form ensuring compliance with the confidentiality obligations, and allow adversarial debate on these factual observations.

Or:

2. **Appoint** an expert with the task of:

   o   obtaining the relevant documents under conditions such as to preserve their confidentiality;

   o   examining the said documents in the presence of the parties' attorneys, but excluding the parties themselves;

   o   determining whether (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and Orange; (vi) ALU has delivered DSLAMs to Orange pursuant to that supply agreement;

- **Order** the parties to provide the expert with the relevant documents;

- **Order** that each participant to the expert proceedings shall submit an undertaking in writing to keep strictly confidential all the information exchanged during those proceedings, and to not disclose them to any third party (including the parties to the present litigation);

- **Order** the expert to submit his/her report, with taking care to preserve the confidentiality of the documents provided, to the Paris First Instance Court Registry within a period of eight weeks after the start of the expertise;

- **State that,** in the event of a challenge relating to the expertise, any hearing before the Court on this subject will be held in closed session;

Or:

3. **Order** the organisation of a confidentiality club comprising the outside counsel to each party to the proceedings;

- **Order** that each participant to the confidentiality club shall submit an undertaking in writing to keep strictly confidential all the information exchanged during those proceedings, and to not disclose them to any third party (including the parties to the present litigation);

- **Order that** this confidentiality club examines the relevant documents under conditions such as to preserve their confidentiality;

- **Order that** the confidentiality club determines whether (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and Orange; (vi) ALU has delivered DSLAMs to Orange pursuant to that supply agreement;

- **Order that** the confidentiality club drafts a joint report on its determinations;

- **Order that** any dispute on the functioning or conclusions of the confidentiality club shall be submitted to the Judge in charge of the proceedings, who shall hear it in closed session;

Or:

4. **Order** any other investigative measure the Judge in charge of the proceedings should consider appropriate, under conditions allowing the disclosure of the confidential documentation (i) only to the Court and counsel to the parties, to the exclusion of the parties themselves, (ii) subject to a binding confidentiality commitment by those persons accessing the information, (iii) with a view of providing the Court and the parties with a report on whether (i) Intellectual Ventures has licensed a patent portfolio, including EP 020, to Nokia; (ii) Nokia has extended the benefit of the license to ALU; (iii) the arbitral tribunal has determined that Nokia was entitled to do so; (iv) the PLA allows Intellectual Ventures to terminate the licenses granted to Nokia and its affiliates if any of them challenges the validity or scope of a licensed patent; (v) there is a supply agreement between ALU and Orange; (vi) ALU has delivered DSLAMs to Orange pursuant to that supply agreement;

**C.** In any event,

**Order** INTELLECTUAL VENTURES II LLC to pay to ALCATEL-LUCENT INTERNATIONAL the amount of 50,000 € (FIFTY THOUSAND EUROS) pursuant to Article 700 of the French Civil Procedure Code;

**Order** INTELLECTUAL VENTURES II LLC to pay the judicial costs and rule that these costs may be collected by Me David Por, Attorney at law, pursuant to Article 699 of the French Civil Procedure Code.

**WITH ALL DUE RESERVES**

## LIST OF EXHIBITS

**Exhibit No. 1:**    Intellectual Ventures Fact-sheet and partial translation

**Exhibit No. 2:**    Intellectual Ventures' web page and partial translation

**Exhibit No. 3:**    Press article on Les Echos du Net, "*Fixed and mobile telephony markets in France*"

**Exhibit No. 4:**    Press article on Journal du Net, "*Broadband and very high bandwidth market shares in France*"

**Exhibit No. 5:**    Extract of Nokia's website – Our history and partial translation

**Exhibit No. 6:**    Extract of Nokia's website – Stock information and partial translation

**Exhibit No. 7:**    Nokia press release of 5 January 2016 and partial translation

**Exhibit No. 8:**    Public version of Intellectual Ventures' petition to vacate the Award

**Exhibit No. 9:**    Public version of Intellectual Ventures' opening brief

**Exhibit No. 10**:    Public version of Nokia's Cross-Petition to Confirm Arbitral Award

**Exhibit No. 11**:    Writ of summons in the German proceedings and partial translation

**Exhibit No. 12:**    Official letter of 31 January 2018

**Exhibit No. 13**:    Paris First Instance Court, 7 September 2012, No. 10/02595

**Exhibit No. 14:**    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 November 2013, No. 12/14922

**Exhibit No. 15:**    Paris First Instance Court, 10 November 2011, No. 10/06335

**Exhibit No. 16:**    Paris First Instance Court, order of the Judge in charge of the proceedings, 6 July 2006, No. 05/17791

**Exhibit No. 17:**    Paris First Instance Court, order of the Judge in charge of the proceedings, 29 June 2001, No. 00/10470

**Exhibit No. 18:**    ECHR, 21 March 2000, Dulaurans vs. France, App. No. 34553/97

**Exhibit No. 19:**    Colmar Court of Appeals, Civ. 1st, 20 March 1991, Jurisdata 1991-049916

**Exhibit No. 20:**    Lyon Court of Appeals, 25 February 2016, No. 15/09016

**Exhibit No. 21:**    Douai Court of Appeals, 28 May 2015, No. 15/01372

**Exhibit No. 22:**    Paris First Instance Court, order of the Judge in charge of the proceedings, 1st September 2017, No. 15/07015

| | |
|---|---|
| **Exhibit No. 23:** | Paris First Instance Court, order of the Judge in charge of the proceedings, 1st December 2003 |
| **Exhibit No. 24:** | Paris Court of Appeals, 5 October 2011, No. 09/02423 |
| **Exhibit No. 25**: | Paris First Instance Court, order of the Judge in charge of the proceedings, 3 September 2010, No. 09/13109 |
| **Exhibit No. 26:** | Paris First Instance Court, 13 February 2015, No. 15/00822 |
| **Exhibit No. 27:** | Paris First Instance Court, 18 June 2015, No. 15/05243 |
| **Exhibit No. 28:** | Paris First Instance Court, interim proceedings, 12 December 2014, No. 14/60652 |